**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO.   5:05 CR 419** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **SENTENCING ORDER** |
| **CLAYTON B. SMITH** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

**I.     BACKGROUND**

On August 31, 2005, the Grand Jury of the United States District Court for the Northern District of Ohio issued an Indictment charging the defendant, Clayton B. Smith, with two counts of violating the mail fraud statute, 18 U.S.C. § 1341, ("Counts I & II"), one count of wire fraud, a violation of 18 U.S.C. § 1343, ("Count III"), and one count of bank fraud, a violation of 18 U.S.C. § 1344, ("Count IV"). See (Dkt. # 1). The matter was assigned to Senior United States District Judge John M. Manos.

The Defendant appeared before United States Magistrate Judge James S. Gallas on September 19, 2005 represented by Assistant Federal Public Defender Dennis Terez. See (Dkt. # 6). The Defendant entered a plea of not guilty to all counts and Magistrate Judge Gallas ordered that the Defendant be released on a $20,000.00 unsecured bond. (Dkt. # 5; Dkt. #6).

The Defendant thereafter retained Attorney Lawrence J. Whitney as counsel. See (Dkt. # 19). Judge Manos held several pretrial conference whereby the parties indicated that they had entered into plea negotiations. See (Dkt. # 10; Dkt. # 11; Dkt. # 12). Judge Manos continued the trial.

Judge Manos ultimately entered a recusal order in the matter and the undersigned accepted reassignment of the case. See (Dkt. # 12). Following another continuance at the Defendant's request, see (Dkt. # 16), the Defendant entered into a plea of guilty to the Indictment on February 24, 2006. The Court continued the Defendant's bond and scheduled the matter for sentencing.

The Defendant thereafter filed a sentencing memorandum wherein he objected to the guidelines calculations presented in the Presentence Investigation Report ("PSI Report"). See (Dkt. # 18). Specifically, the Defendant objected to the $413,681.50 amount of loss calculation determined by the Probation Officer. The Defendant countered that the amount of loss was over $30,000.00 but less than $70,000.00.

The Court held a sentencing hearing on May 2, 2006 whereby it addressed the objections to the PSI Report filed by the Defendant. Assistant United States Attorney James C. Lynch presented a series of exhibits to the Court and examined Gale Stephanic of Sterne, Agee and Leach, and James Weant of Second National Bank, as witnesses. Attorney Whitney cross-examined each witness and called Kent McClelland, formerly of Shepard & Vrbanac Securities, as a witness supporting the Defendant's challenge to the amount of the loss. The Court ultimately continued the sentencing hearing in order to afford the parties leave to supplement their arguments.

The Court held the second sentencing hearing on August 17, 2006. Attorney Whitney appeared on behalf of the Defendant. Assistant United States Attorney Lynch appeared on behalf of the Government.

Having examined the record and considered the statements of the Defendant, defense counsel and the Government, the Court hereby issues the following sentencing order.

## II.     LAW AND ANALYSIS

The Sentencing Reform Act of 1984 ("SRA") requires that the district court "impose a sentence sufficient, but not greater than necessary" to comply with a number of enumerated factors. See 18 U.S.C. 3553(a). These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the defendant's sentence "to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," "protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1)-(2). See also 18 U.S.C. § 3553(a)(3), (6)-(7) (listing additional factors). Also included among the section 3553(a) factors are "the applicable category of offense committed by the applicable category of the defendant as set forth in the [United States Sentencing Commission][G]uidelines" and "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(4)-(5).

In United States v. Booker, 543 U.S. 220 (2005), the United States Supreme Court severed and rendered inapplicable 18 U.S.C. §§ 3553(b)(1) and 3742(e), which made adherence to the Guidelines mandatory. The Booker decision transformed the Guidelines

into an advisory resource. It follows that "[w]hile not bound to apply the Guidelines," the district court now "must consult those Guidelines and take them into account when sentencing" in accordance with 18 U.S.C. § 3553(a). Booker, 125 S. Ct. at 764. Otherwise stated, "[o]nce the appropriate advisory Guideline range is calculated, the district court throws this ingredient into the section 3553(a) mix." United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006).

The United States Court of Appeals for the Sixth Circuit has discussed sentencing in the post-Booker regime as follows:

> Booker did not eliminate judicial factfinding. Instead the remedial majority gave the district courts the option, after calculating the guidelines range, to sentence a defendant outside the resulting guideline range. District courts, in cases such as these, must therefore, calculate the guidelines range as they would have done prior to Booker, but then sentence defendants by taking into account all of the relevant factors of 18 U.S.C. 3553, as well as the guidelines range.

United States v. Stone, 432 F.3d 651, 654-655 (6th Cir. 2005) (footnote and internal citations omitted).

While controlling authority has not established what weight the district court should accord the Guidelines relative to the other sentencing factors listed in § 3553(a), the Sixth Circuit has rejected the argument "that a sentence within a proper Guidelines range is per-se reasonable." See United States v. Webb, 403 F.3d 373, 385 n.9 (6th Cir. 2005). However, a sentence that falls within the advisory Guidelines range is accorded "a rebuttable presumption of reasonableness." United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006). This "does not mean that a Guidelines sentence will be found reasonable in the absence of evidence in the record that the district court considered all of the relevant section

-4-

3553(a) factors." United States v. Foreman, 436 F.3d 638,644 (6th Cir. 2006). Indeed, the Sixth Circuit has stated:

> This rebuttable presumption does not relieve the sentencing court of its obligation to explain to the parties and the reviewing court its reasons for imposing a particular sentence. Even when selecting a presumptively reasonable sentence within the Guidelines range, a district court must "articulate[] its reasoning sufficiently to permit reasonable appellate review, specifying its reasons for selecting" the specific sentence within that range. A district court "need not recite these [§ 3553(a)] factors but must articulate its reasoning in deciding to impose a sentence in order to allow for reasonable appellate review." We emphasize the obligation of the district court in each case to communicate clearly its rationale for imposing the specific sentence. Where a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it. This assures not only that the defendant can understand the basis for the particular sentence but also that the reviewing court can intelligently determine whether the specific sentence is indeed reasonable.

United States v. Richardson, 437 F.3d 550, 554 (6th Cir. 2006) (internal citations omitted).

Accordingly, the Court will first calculate the range prescribed by the Guidelines. The Court will proceed to examine the advisory Guidelines range as well as other relevant factors set forth in the Guidelines. After considering the other factors listed in section 3553(a), the Court shall determine whether an advisory Guidelines sentence should be imposed. See United States v. Buchanan, 449 F.3d 731, 734 (6th Cir. 2006) ("In our view, the court demonstrated a model approach to sentencing in the aftermath of Booker. The judge properly calculated the guidelines range, then carefully considered the appropriateness of that range as applied to the defendant before him in light of the concerns encompassed by the statutory factors. Balancing competing interests, goals and individual characteristics, the court found the recommended guidelines range to be appropriate and chose to sentence

Buchanan at the bottom of that range to 'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth' in the § 3553(a)(2) factors.") (Citation omitted).

*Advisory Guidelines Range*

As a threshold matter, the Defendant, his counsel and the Government agree that the 2001 version of the Guidelines applies to this matter. The parties further agree that pursuant to the grouping rule found in U.S.S.G.§ 3D1.2(d) (relating to amount of loss) that the four counts are grouped for sentencing purposes. Applying the grouping rule and U.S.S.G.§ 2B1.1(a) (dealing with Fraud) as determined by the Probation Officer, the Court finds that the base offense level is six.

The gravamen of the Defendant's sentencing memoranda is that the amount of loss is limited to the actual loss suffered by the victims – specifically, an amount the Defendant calculates to be $66,007.79. See (Dkt. #19 at 1-2, 6). As a result, the Defendant alleges that a total of six levels should be added pursuant to U.S.S.G.§ 2B1.1(b)(1)(D) (amount of loss More than $30,0000 but less than $70,000) rendering an adjusted offense level of 12 (prior to any U.S.S.G.§ 3E1.1(a) adjustments for acceptance of responsibility). However, the PSI Report indicates that an adjusted offense level of twenty is appropriate pursuant to U.S.S.G.§ 2B1.1(b)(1)(H) because the amount of actual and intended losses is $413,681.50 (More than $400,000 but less than $1,000,000).

Section 2B1.1 of the 2001 version of the Guidelines governs the calculation of loss for offenses involving fraud or deceit. See U.S.S.G.§ 2B1.1. That section begins by assigning a base offense level of six, and then increasing the base offense level by the amount

of loss. See U.S.S.G. § 2B1.1. Under Section 2B1.1, a court need not determine the amount of loss with precision. See U.S.S.G. § 2B1.1., application note 2(C). Rather, the court need only calculate a reasonable estimate of the loss and may base this estimate on factors such as the number of victims and the average loss to each victim or general factors such as the scope and duration of the offense. Id.

Section 2B1.1 applies to loss that is either actual or intended. See United States v. Wade, 266 F.3d 574, 586 (6th Cir. 2001). Application note 2 to U.S.S.G. § 2B1.1 distinguishes between "actual loss" and "intended loss" by stating that in a determination of loss under this guideline, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.2 (2001). Consequently, three factors must be present for an amount of loss to be considered for purposes of sentencing under the Guidelines: "First, . . . the defendant must have intended the loss. Second, it must have been possible for the defendant to cause the loss. Third, the defendant must have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss." United States v. Watkins, 994 F.2d 1192, 1196 (6th Cir. 1993). "The intended loss must have been possible to be deemed relevant," which means that it must "'reflect economic reality.'" Id. (quoting United States v. Khan, 969 F.2d 218, 221 (6th Cir. 1992)). Therefore, "regardless of the defendant's intent, the defendant may not be sentenced on the basis of harm that he or she was incapable of inflicting." Id.

The Government has demonstrated by a preponderance of the evidence that the amount of actual loss was $68,286.95. The Government has demonstrated through the exhibits presented at the sentencing hearing and the testimony of Gale Stephanic that the

-7-

Defendant attempted to purchase through Sterne, Agee and Leach, Inc. ("SAL") securities requiring payment of $165,689.25. See (Gov't. Ex. # 2). SAL purchased the securities and requested payment from the Defendant within the standard four day clearing period. SAL ultimately received two drafts from the Defendant in the amounts of $29,232.25 and $52,363.75 respectively. See (Gov.'t Ex. # 2). These drafts thereafter were returned non-sufficient funds ("NSF"). See (Gov.'t Ex. # 2). After attempting to remedy the matter with the Defendant, SAL sold the securities in the open market for $117,868.29 – resulting in an actual loss of $47,820.96. See (Gov.'t Ex. # 2).

The Government further has demonstrated through exhibits that the Defendant attempted to purchase from Schneider Securities, Inc. ("Schneider") approximately $67,000.00 in securities. See (Gov.'t Ex. # 4). The Defendant again attempted to purchase the securities from a checking account having insufficient funds. See (Gov.'t Ex. # 4). The evidence presented in the PSI Report reveals that Schneider suffered an actual loss of $18,813.78.[1] See (PSI Report ¶¶ 13, 70).

The Government additionally has demonstrated that the Defendant attempted to purchase from TD Waterhouse Investor Services, Inc. ("TD Waterhouse") $30,665.00 in securities. See (Gov.'t Ex. # 2A). One check the Defendant utilized to purchase the securities in the amount of $5,800.00 was returned NSF. See (Gov.'t Ex. # 2A). The actual loss to TD Waterhouse was $1,652.21. See (Gov.'t Ex. # 2A).

---

[1] The PSI Report initially indicates that the amount of actual loss and requisite restitution was $18,813.78. See (PSI Report ¶¶ 13, 70). However, in response to the Defendant's objections, the Probation Officer listed the amount of actual loss as $17,913.78. The increase in the actual loss was the result of interest due on the deficit created by the Defendant.

With limited exception, the Defendant does not dispute the foregoing calculation as to the amount of actual loss. The Defendant's primary objections to the amount of loss address the amount of intended loss determined by the Probation Officer. In short, the PSI Report included in the total amount of loss all securities requested for purchase by the Defendant regardless of the victim's subsequent sale of the securities on the open market. The PSI Report therefore calculates the amount of loss as follows:

| | |
|---|---|
| Sterne Agee and Leach, Inc. | $165,689.25 ($47,820.96 in actual loss) |
| Schneider Securities | $67,000.00 ($18,813.78 in actual loss) |
| TD Waterhouse Investor Services, Inc. | $30,665.00 ($1,652.21 in actual loss) |
| Shepard & Vrbanc Securities, Inc. | $84,727.25 |
| L&M Financial Services | $34,600.00 |
| Continental Brokers – | $31,000.00 |
| | $413,681.50 |

The Defendant objects to the Probation Officer's finding that $360,485.55 in intended losses resulted from the Defendant's conduct. The Defendant contends that as the victims retained an interest in the securities at the time of purchase, the victims' subsequent sale of the securities on the open market precludes a finding that the Defendant intended losses in excess of that loss actually suffered by the victims. In support of this argument, the Defendant analogizes the present case to that of secured loan fraud. Application Note 2(E) to Section 2B1.1 of the Guidelines pertains to secured loan fraud and provides:

> Loss shall be reduced by the following: . . .(ii) In a case involving collateral pledged or otherwise provided by the defendant the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral.

-9-

U.S.S.G. § 2B1.1, application note 2(E)(ii). It follows that in a secured loan fraud case, the loss amount should be offset by the assets pledged to secure the loan. See United States v. Wright, 60 F.3d 240,241 (6th Cir. 1995). The Defendant requests the Court to follow a similar procedure and offset the loss amount by the funds received from the victims' subsequent sale of the securities.

The touchstone in a secured loan fraud case is that the transaction involves collateral. United States v. Flowers, 55F.3d 218, 221 (6th 1995) ("The offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return.") (Citation omitted). Generally, "the dual purpose of collateral is to secure financing for the borrower and hedge against credit risk for the lender." Layne v. Bank One, 395 F.3d 271,278 (6th Cir. 2005). The Defendant contends that the victims' retention of an interest in the securities was akin to collateral in the secured loan transaction. Upon the Defendant's failure to present the purchase funds within the required period, the victims exercised their interest in the "collateral" and sold the securities.

Neither the parties nor the Court have located any authority addressing a factual scenario directly similar to that presented at bar. The Defendant attempts to support his argument by relying upon United States v. Quigley, 382 F.3d 617 (6th Cir. 2004), where the United States Court of Appeals for the Sixth Circuit offset the amount of loss by the value of the collateral in a case "technically different" from a secured loan fraud case. See id. at 622. The Defendant misplaces his reliance on Quigley as a full reading of the case supports the Government's position.

-10-

In Quigley, the defendant was a participant in a mortgage company that was alleged to have misused funds provided by third party lenders. See id. at 619. The contracts establishing the relationship between the mortgage company and one third party lender – the victim – ultimately granted the victim a security interest in all loans closed by the mortgage company as well as an interest in "each and every instance of indebtedness, loan, and asset" belonging to the mortgage company. See id. at 619. The mortgage company thereafter ceased its operations and the victim obtained all of the mortgage company's loans and sold the loans at a profit. See id. at 619.

The Defendant was charged and convicted with wire fraud predicated on the mortgage company's misuse of the funds for purposes other than closing loans. See id. at 620. At the time of sentencing, the defendant asserted that the amount of loss should be offset by (1) cash received by the victim representing the profits from loans originated by the mortgage company, fully funded, and sold to another party; (2) loans received by the victim from the mortgage company, fully funded, but had not been sold at a profit; and (3) loans originated by the mortgage company, not funded, and therefore, not sold. See id. at 620. The district court declined to address the defendant's contention, electing rather to grant a downward departure on the basis of substantial assistance. See id. at 621.

The Sixth Circuit vacated the sentencing, finding that the amount of loss should have been offset by the cash received by the victim. See id. at 622. In reaching its conclusion, the court found false loan application cases "extremely relevant" because "[i]n both types of cases, a Defendant obtains a loan under false pretenses while providing the lender with collateral. The lender is thus able to offset some of his loss through the use of collateral."

See id. at 622. The court went on, however, to find that non-cash collateral held by the victim was irrelevant to the amount of loss determination. The court specifically opined:

> Unlike the case in category (1), the profit on the sales of loans was mere expectancy. The [mortgage lender] was *virtually* assured of the profit because of its contractual relationship with [a third party], but it was not *guaranteed* that the sale would take place or that the amount realized would be as expected. It is possible that some event may have intervened to prevent [the mortgage company] from making the profit, thereby depriving [the victim] of funds. With respect to category (3), [the victim] obtained loans in the amount of approximately $5.8 million that were originated by [the mortgage company]. [The victim] then funded those loans and sold them to [a third party] resulting in a "lost profit" to [the mortgage company] of $384,390. As with category (2), we find that the Defendant is not entitled to an offset that represents a profit that [the mortgage company] *may have* earned if it funded the loans and sold them.

See id. at 623.

Contrary to the Defendant's assertion that the interests in the securities held by the various victims in the present case were akin to the immobile collateral utilized to offset a loss in the traditional fraudulent secured loan transaction scenario, the victims held the indefinite expectancy interests that the Sixth Circuit explicitly found irrelevant to the amount of loss determination. While it was "virtually assured" that the securities at issue would not diminish to the point of being completely devoid of value, it was "possible that some event may have intervened" to deprive the victims of the funds. The facts of the present case reveal that this risk extends beyond conjecture. The Defendant agreed to purchase securities from SAL in late August 2001. By the time SAL discovered the Defendant's unlawful conduct, the securities markets experienced a steep decline as the result of the September 11, 2001 tragedy. Moreover, the Court's goal in determining the amount of loss is the to find the maximum loss that a reasonable person in the defendant's position could have intended.

-12-

"[T]he defendant's intent is the touchstone." United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005). The Sixth Circuit has acknowledged the intent of individuals engaging in conduct similar to that engaged in by the Defendant:

> These were personal market transactions initiated by [the defendant], wrongfully inducing a broker to commit its resources and placing them at risk subject to the vagaries and fluctuations of market price. There was ample evidence, if believed by the jury, to indicate that [the defendant] misrepresented his financial situation and that he did not intend at the outset to carry through with the transaction unless the price of the ordered stocks rose, enabling him to make a profit. Furthermore, defendant accomplished his plan through material misrepresentations, lulling the broker into transferring the risk to itself.

United States v. Tager, 788 F.2d 349,355 (6th Cir. 1986). The Defendant has admitted through his plea of guilty to the Indictment that he intended to defraud the victims in this case. This was not an exclusive instance of fraud – rather, the Defendant engaged in systemic pattern of attempting to purchase more than $400,000.00 in securities from multiple brokers while lacking the assets to complete the sale. The Defendant took a gamble. "Much like any gambler, [the Defendant] did not intend to fail at his venture; nevertheless, gamblers often lose." United States v. Lane, 323 F.3d 568, 591 (7th Cir. 2003). The Defendant did not gamble with his own assets. He intended to place the risk on the victims in this case to the tune of $ 413,681.50.

The Government also has demonstrated by a preponderance of the evidence that Second National Bank suffered a loss in the amount of $15,091.00. See (Gov.'t Ex. # 1). The Defendant attempted to deposit a check drawn on his account at Ohio Legacy Bank in the amount of $15,091.00 into a Second National Bank account. The Defendant then sent a copy of the check to Schneider. There were insufficient funds for the deposit. Following

numerous attempts to resolve the matter, the Defendant's sister submitted payment to Second National Bank.

The Defendant challenges the inclusion of $15,091.00 in the calculation of the amount of loss because repayment was made in accordance with Ohio law. See (Dkt. # 19 at 2 & Exs. A-C) (citing OHIO REV. CODE § 2913.11). Specifically, the Defendant asserts that repayment was made "within ten days of receipt of the formal notice sent by Jackson Township." (Dkt. # 19 at 2.) The Defendant cites no authority – and this Court likewise has not located any in the Federal Reporters – that applies state "passing bad check" laws to the relevant provisions of the United States Sentencing Guidelines. The only credit against loss allowed by the Guidelines is money "returned to the victim before the offense was detected." U.S.S.G § 2B1.1, cmt. n.2(E). "The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Id. It is uncontroverted that the victim – Second National Bank – became aware of the insufficient deposit in early October and began collection efforts at that time. It is further uncontroverted that the Defendant (through his Defendant's sister) did not make any repayment until December 24, 2001. See (Dkt. # 19 at 2). It follows that this payment does not constitute a credit against loss pursuant to the Guidelines because Second National Bank was aware of the loss prior to the Defendant's attempt to make restitution.

For the foregoing reasons, the Court finds that the amount of loss in this matter was $428, 772.50.

-14-

In light of the foregoing, the advisory Guidelines range is as follows:

| | |
|---|---|
| <u>Base Offense Level pursuant to U.S.S.G.§§ 3D1.2(d) & 2B1.1(a)</u> | 6 |
| <u>Amount of Loss pursuant to U.S.S.G.§ 2B1.1(b)(1)(H)</u> | +14 |
| <u>Adjustment for acceptance of Responsibility U.S.S.G.§ 3E1.1(b)</u> | -2 |

The application of these enhancements results in a total base offense level 18. It is undisputed that the Defendant's criminal history category is I. Accordingly, the advisory Guidelines range is 27-33 months.

*Remaining 18 U.S.C. § 3553 factors*

Turning to the remaining section 3553 factors, the Court concludes that a sentence of 27 months is sufficient, but not greater than necessary, to comport with the sentencing goals of punishment, deterrence, and safety to the community as reflected in section 3553.

The Defendant is fifty-three years old. He is the father of two children from whom he is estranged. There lacks any evidence that he suffers from substance abuse or mental health problems. The Defendant has no criminal history except for the conduct at issue. He has a real estate degree He is an experienced businessman and capable of living a law-abiding life when he is released from imprisonment..

While the offense is one commonly referred to as "white collar", that does not diminish the seriousness of this offense. This was a scheme involving multiple parties and fraudulent activities repeated a number of times. It involved large sums of money. It jeopardized confidence in victims in the eyes of the public. It directly affected several victims that personally were required to make restitution to their employer as a result of their dealings with the Defendant. It is beyond question that the Defendant understood the

illegality of his actions but nevertheless decided to engage in this criminal conduct. A term of imprisonment of 27 months to the extent presented in the low end of the advisory Guidelines range sufficiently will punish the Defendant as well as promote respect for the law. Similarly, the Court finds that this sentence within the advisory Guidelines range will deter the Defendant and others from committing this or similar conduct in the future.

Accordingly, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the Defendant, Clayton B. Smith, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 27 months. Upon release from imprisonment, the Defendant shall be placed on supervised release for a term of 3 years. The Defendant shall comply with all terms and conditions of supervised released imposed on the Defendant at the sentencing hearing that were entered into the record. The Defendant shall pay restitution as follows:

> Sterne, Agee and Leach in the amount of $45,601.80
>
> Schneider Securities, Inc. in the amount of $18,813.78
>
> TD Waterhouse Investor Services, Inc. in the amount of $1,652.21

The terms of restitution shall be set forth by separate order. The Defendant shall pay a special assessment of $400.00.

**IT IS SO ORDERED**.

> **/s/ Peter C. Economus -** August 17, 2006
> PETER C. ECONOMUS
> UNITED STATES DISTRICT JUDGE